Opinion issued March 10, 2022



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00464-CV

————————————

**BDTP, LLC, SHAWN NYAHAY, AND WESLEY T. FORTUNE, Appellants**

**V.**

**UNITED STRUCTURES OF AMERICA, INC., PRECISION BUILDING SYSTEMS, INC., ERWIN WEEKS CRAWFORD, IV, AND ASHLEY CRAWFORD, Appellees**

On Appeal from the 125th District Court
Harris County, Texas
Trial Court Case No. 2019-48435

**MEMORANDUM OPINION**

Appellants Shawn Nyahay and Wesley T. Fortune appeal the trial court's order denying their joint special appearance.[1] *See* TEX. R. CIV. P. 120a; TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7). Because they have sufficient minimum contacts with Texas, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice, we conclude that the trial court properly exercised personal jurisdiction over Fortune and Nyahay. We affirm the trial court's order.

**Background**

*USA's suit*

United Structures of America, Inc. (USA), a Houston-based company, makes fabricated steel buildings for commercial and industrial use. USA filed the instant suit, later amending its petition, against (1) Precision Building Systems, Inc., a Texas corporation, (2) Precision's owners, Texas residents Erwin Weeks Crawford, IV and Ashley Crawford, (3) Ohio residents Shawn Nyahay and Wesley T. Fortune, and (4) BDTP, LLC, an Ohio limited liability company.

In its amended petition, USA alleged that in the spring of 2018, Precision contacted it "to engage USA to design, fabricate, and supply a steel building for use as an indoor baseball facility in Ohio. The building was to be made for use by and delivered to BDTP in Ohio." Before they had contacted USA, "the Crawfords were

---

[1]     BDTP, LLC filed the joint special appearance along with Fortune and Nyahay. BDTP also appealed the order, but as discussed *infra*, its appeal has been dismissed.

2

befriended by Wesley T. Fortune, an Ohio lawyer, who was interested in acquiring Precision's help to bring to fruition his dream of an indoor baseball facility." Fortune knew that "Precision and/or the Crawfords had a relationship with USA who was able to design, fabricate, and build the desired metal building" for the baseball facility "at a price less than similar companies in Ohio." USA alleged that "Fortune went to great lengths to gain the trust of and build a relationship with Precision and/or the Crawfords, including several telephone calls, emails, meetings, and paying for the Crawfords' child to fly to Ohio to play baseball." USA claimed that "Fortune's efforts paid off" because "Shawn Nyahay, individually and/or as a representative of BDTP, executed a contract with Precision for the procurement, construction, assembly, and delivery of a metal building." USA pointed out that Precision's contract "provided for jurisdiction in Texas, and the contract would be performed in Texas."

USA further alleged in its amended petition that, about one month after the contract was signed, "Shawn Nyahay on behalf of BDTP entered into a change order with Precision for the baseball facility." It also claimed that, around that time, "Fortune organized 6 Ohio limited liability companies, one of which was BDTP and another was Premier 365 Baseball Training, LLC. Premier 365 is the name under which the indoor baseball facility operates and displays to the public." USA pointed

3

out that "Fortune's law firm and Premier 365 Baseball operate out of the same office space, which happens to be the same mailing address for BDTP."

"[O]n March 23, 2018, Precision contracted with USA for USA to design, fabricate, and deliver a large steel building for the benefit of BDTP, Shawn Nyahay, and Wesley T. Fortune." The building "was to be used to house the Premier 365 indoor baseball facility." USA asserted that "BDTP, Wesley T. Fortune, and/or Shawn Nyahay made a total payment to Precision of $81,500.00" based on the Precision contract "between Precision and BDTP and/or Shawn Nyahay." The contract between Precision and USA required Precision to pay USA "10% of the contract price" when the contract was signed, but Precision failed to pay that amount. "Instead, Precision/the Crawfords issued partial payment to USA for 5% of the contract price four months after the contract was signed," but made no other payment.

USA "completed and delivered the fabricated steel structure" to an address "in Ohio and [was] told the property was owned by or was used by BDTP." Fortune met the truck carrying the building, "who instructed the driver to take the building to 4431 Carroll Southern Road in Carroll, Ohio." That location also "houses Fortune's law office and Premier 365 baseball" and was "the mailing address for BDTP."

The amount USA charged for the building had not included sales tax because "Precision and/or Wesley T. Fortune, individually and/or on behalf of BDTP" had represented to USA that "a 501(c)(3) [organization] in Ohio, Pickerington Travel Baseball Organization, was related to the purchase of the building." USA alleged that Fortune provided USA with an IRS tax exempt certificate for Pickerington. But "USA later learned this was false," when "USA received a letter from Fortune stating that Pickerington had 'revoked' its association with BDTP's purchase of the structure" and instructed USA to add sales tax.

USA claimed that "Precision and/or the Crawfords" owed it a balance "of at least $235,414.24." USA sent demand for payment to Precision. Precision told USA that it had not been paid by BDTP. USA alleged that BDTP had made payments to Precision in March and August 2018 totaling $81,500, but the funds were "not paid to USA within seven days of receipt by Precision as required by Texas law." USA further alleged that, after it demanded payment, "Fortune and/or BDTP began making claims that the pre-approved financing had fallen through." USA asserted that, based "[o]n information and belief, Fortune, BDTP, and/or Nyahay never secured financing and never intended to pay for the building made by USA."

In its amended petition, USA pleaded claims for breach of contract, suit on a sworn account, and promissory estoppel against Precision and the Crawfords. USA also asserted claims for unjust enrichment, quantum meruit, and violation of the

5

Prompt Payment to Contractors Act[2] against Precision, the Crawfords, BDTP, Fortune, and Nyahay.

### *Defendants' special appearance*

Nyahay, Fortune, and BDTP filed a joint special appearance, claiming that the trial court lacked personal jurisdiction over them and requesting that they be dismissed from the suit. They asserted that USA "failed to carry [its] burden to establish general jurisdiction or specific jurisdiction and the evidence demonstrates [that] BDTP, Nyahay, and Fortune have no jurisdictional presence in Texas and did not establish minimum contacts with Texas sufficient for [the trial court] to exercise jurisdiction over them."

The three defendants supported their special appearance with Nyahay's and Fortune's affidavits. Each testified that he was a long-time Ohio resident with no financial connections with Texas and that he had not traveled to Texas relating to the purchase of the building. Nyahay testified that he was "a member of BDTP," an Ohio limited liability company with its principal office in Ohio and no offices or employees in Texas. He also testified that BDTP was not registered to do business in Texas and had no bank accounts, employees, or real property in Texas. Fortune testified that, with respect to the purchase of the building, he had acted as BDTP's

---

[2]    *See* TEX. PROP. CODE §§ 28.001–.010.

attorney and had communicated with Precision and USA only in his capacity as BDTP's counsel.

Nyahay's and Fortune's affidavit testimony diverged from some of the factual allegations in USA's amended petition. Nyahay and Fortune testified that, in early 2018, BDTP wanted to construct an indoor baseball facility in Ohio, and BDTP had reached out to suppliers across the country to find the best price for a prefabricated structure to use for the facility. Fortune had coached the Crawfords' son in a baseball tournament in Ohio in 2017, and he recommended that BDTP contact Weeks Crawford about the project. Fortune claimed that he did not know where Crawford's company was located, but he thought that it conducted business in Texas and Louisiana.

Fortune testified that he had not been aware of Precision's relationship with USA, and Nyahay testified that, initially, BDTP "did not know of USA, did not have any communications with USA, request bids from USA, or receive bids from USA." Nyahay stated that BDTP received a price quote from Precision, which he signed on February 16, 2018. Nyahay attached the two-page price quote to his affidavit. He claimed that the price quote "did not provide for jurisdiction in Texas or contain any form of forum selection clause." Nyahay testified that, when he received the price quote, Precision did not inform BDTP that Precision was "subcontracting the work to USA." He averred that Precision had represented that "it was doing business with

7

numerous building suppliers and did not communicate to BDTP the names of those suppliers" or their locations.

Nyahay testified that BDTP made two payments to Precision but that its "financing fell through." He stated that a request was made to Crawford to delay the shipment of the prefabricated building because of the financing issue and because zoning conflicts had arisen at the baseball facility's proposed location. Crawford said that he "would see what he could do" about delaying delivery. However, in August 2018, "BDTP received a call from Crawford saying the structure was in route from Tennessee," despite the request for the delay.

Nyahay averred that he had "never communicated with USA, Precision, or Weeks Crawford in my individual capacity" but had communicated with them only "in [his] capacity as a member of BDTP" while he was in Ohio. Similarly, Fortune testified that he had communicated with Precision and USA only from Ohio and only in his capacity as BDTP's attorney.

### USA's response

In its response to the special appearance, USA asserted that the trial court had specific jurisdiction over BDTP, Nyahay, and Fortune because they had "targeted a Texas company for the purchase of an indoor baseball facility and purposefully availed themselves [of] the privilege of doing business in Texas." In support of its position, USA contended that the three defendants had "specifically chosen

Precision for the project," knowing that Precision conducted its business in Texas. USA claimed that "[t]he Defendants admit that Nyahay initiated contact with Precision by reaching out to the Texas company for a bid on the Project for BDTP." USA also pointed out that the "entire time the Defendants were soliciting and negotiating with Precision and the Crawfords [they] were located and residing in Texas."

USA asserted that the parties had "expressly agreed that the contract would be performed in Texas," citing Precision's performance under the contract "completely in Texas" and stating, "Precision and USA negotiated and consummated their subcontract agreement in Texas and under Texas law." USA asserted that "[t]he Defendants knew . . . that Precision would subcontract the project to USA." USA stated that, "[w]ithout Precision's connection to USA, BDTP would not have been able to purchase the structure at the price Precision offered."

USA emphasized that it had partially performed its contractual obligations in Texas, asserting that it had "designed the structure, completed the necessary drawings, and engineered the facility from USA's location in Texas." It stated that the "only part of USA's performance that occurred outside of the State of Texas was the physical fabrication of the building after the plans had been completed in Texas." And USA noted that partial payment for the building was sent to Precision in Texas.

USA further pointed out that the three defendants had "directed communications to Texas in furtherance of the transaction." For instance, they asserted that "Fortune communicated with Crawford via email about the project, including requesting changes substantial enough that Crawford had to prepare a change order with an increased cost of the building." USA asserted that Fortune had misrepresented to Crawford that the project was tax exempt.

In addition, USA cited a forum-selection clause in Precision's contract signed by Nyahay. The clause provided, "The laws of the State of Texas shall govern this agreement and performance under this agreement. Buyer consents to jurisdiction in Texas. Any dispute under this agreement shall only be brought in the state court of Texas."

The factual assertions made in USA's response was supported by evidence attached to the response. USA's evidence included not only Precision's contract but other Precision business records, USA's business records relating to the transaction, and several affidavits, including the affidavits of Crawford and Dain Drake, USA's president.

In his affidavit testimony, Crawford provided historical context for the transaction. He explained that he was introduced to Fortune in the spring of 2017 through a mutual friend. Crawford told Fortune that he lived in Texas and was in the

10

construction business there. Crawford explained that part of that business was "securing and building metal structures."

Crawford stated he and Fortune realized that they had much in common because their children played baseball, and they both "were actively involved in [their] children's baseball activities." Fortune told Crawford "that he wanted to build an indoor baseball facility that would allow youth baseball teams and individual players to practice indoors, and attend instruction on various baseball mechanics." Crawford testified that, during those discussions, "Fortune did not hold himself out as a representative of or attorney for BDTP, LLC. Rather, Fortune made clear to me that the building of the indoor facility was a personal venture."

Crawford stated that, in the summer of 2017, Fortune invited Crawford to watch his son play in a baseball tournament in September 2017 in Ohio. Crawford testified that Fortune arranged for the trip and paid for all the associated expenses for him and his family, including airfare, lodging, and meals. During the trip, Fortune and Crawford continued to talk about Fortune's desire to build an indoor training facility in Ohio. After the trip, Fortune continued to contact Crawford in Texas by email, telephone, and text message. Crawford said that he believed that he and Fortune "were friends." In one of these conversations, Fortune asked Crawford if Precision could "could help him build the baseball facility," and Crawford said that it could. Given their friendship and "the words used by Fortune," Crawford

understood Fortune to be asking Precision "[to] perform the requested work at a reduced cost."

Crawford testified that, from the start of their conversations about providing a metal building for the baseball facility, he told Fortune that Precision "would subcontract that work to USA." Crawford informed Fortune that his "family ha[d] been subcontracting to USA for almost 20 years and that Precision had an established relationship with USA for the design, fabrication and delivery of the metal building[s]." Crawford testified that Fortune was "happy to use [Precision's] connection" with USA.

Crawford averred that in January 2018, "Fortune contacted [him] in Texas to solicit a price quote from Precision for an entity called BDTP, LLC for construction of the building." Crawford stated that was "the first time [he] had heard of BDTP, LLC." Crawford prepared a price quote and contract "for Precision to provide a fabricated metal structure, done in Texas, for use as a training facility and did so on behalf of Precision from Precision's primary place of business in Texas." He stated that "Fortune, Nyahay and BDTP were aware that Precision was doing work in Texas. Crawford averred that, "[f]rom the beginning," Fortune and Nyahay "were aware that Precision would subcontract the project to USA for design and construction of the building [with] all work being done in Houston, Texas." They knew that USA "was located in Houston and had a primary place of business in

Texas." He testified that he knew that Nyahay and Fortune were aware that Precision and USA were performing their contractual obligations in Texas because Fortune and Nyahay told Crawford that they were aware of where the work was being performed. Crawford also detailed the communications in furtherance of the transaction between him and Fortune after the contract was signed.

The affidavit of USA's president, Dain Drake, confirmed that USA "fully performed its obligations under the contract between USA and Precision." He testified that "USA designed, fabricated, and delivered the metal structure requested by BDTP. The baseball facility was designed by USA in Houston, Harris County, Texas. The baseball facility's drafted drawings (all drafts and final) was performed by USA in Houston, Harris County, Texas." Dain and Crawford each testified that the draft and final drawings of the building were sent to Fortune, who each time returned his approval of the drawings to Precision in Texas.

After USA filed its response in opposition to the special appearance, Precision and the Crawfords filed cross-claims against BDTP, Fortune, and Nyahay. They asserted claims for breach of contract and statutory prompt payment violations.

In their opposition to the special appearance, Precision and the Crawfords asserted that the trial court had jurisdiction over Nyahay, Fortune, and BDTP based on the forum-selection clause in Precision's contract and that sufficient minimum contacts with Texas had been established. Crawford's affidavit was offered in

support of the opposition, which further detailed the events surrounding the solicitation, negotiations, and performance of the Precision contract, including details about his pre-contractual communications with Fortune and Nyahay.

***Trial court's hearing and ruling***

The trial court conducted an evidentiary hearing on the special appearance via Zoom. Fortune, but no other witnesses, testified. Fortune disagreed with some of the factual statements made by Crawford in his affidavit. For instance, Fortune testified that he had engaged in discussions with Crawford about purchasing the building only in his capacity as BDTP's attorney and had not told Crawford that he had a personal interest in building the baseball facility. According to Fortune, BDTP—a limited liability company—was legally formed on February 6, 2018, and Nyahay signed Precision's contract on February 14, 2018. Fortune also testified that he did not know before the contract was signed that Precision would subcontract the job to USA.[3]

The trial court ruled in USA's favor, denying the three defendants' joint special appearance. No findings of fact and conclusions of law were requested or filed.

---

[3] BDTP, Nyahay, and Fortune filed a reply to USA's response on the day of the hearing. The reply offered a new affidavit signed by Fortune with attached documents. The trial court sustained USA's objection to the reply, striking the attached evidence as untimely filed. *See* TEX. R. CIV. P. 120a(3) (providing that "affidavits, if any, shall be served at least seven days before the [special-appearance] hearing").

14

***BDTP's appeal dismissed***

Nyahay, Fortune, and BDTP appealed the trial court's order denying the joint special appearance. Three months after the appeal was filed, their attorney filed a motion to withdraw, which was granted. No new counsel appeared on their behalf.

This Court informed BDTP that "[e]xcept for ministerial tasks, corporations may appear and be represented only by a licensed attorney." *MHL Homebuilder LLC v. Dabal/Graphic Resource*, No. 14–05–00295–CV, 2005 WL 1404475, at *1 (Tex. App.—Houston [14th Dist.] June 16, 2005, no pet.) (mem. op.) (citing *Kunstoplast of Am., Inc. v. Formosa Plastics Corp., USA*, 937 S.W.2d 455, 456 (Tex. 1996)); *see Sherman v. Boston*, 486 S.W.3d 88, 95 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("Legal entities, such as . . . a limited liability company, generally may appear in a district or county court only through a licensed attorney."). We notified BDTP that unless, within 20 days, a licensed attorney filed an appearance on its behalf, its appeal could be dismissed for want of prosecution without further notice. *See* Tex. R. App. P. 42.3. Because no attorney appeared within the 20-day timeframe, we issued an interlocutory order dismissing BDTP's appeal. *See MHL Homebuilder*, 2005 WL 1404475, at *1 (citing Tex. R. App. P. 42.3(c)).

Nyahay and Fortune remained in the appeal. Each has separately filed his own pro se brief, but the briefs are substantively the same.

**Special Appearance**

In their respective briefs, Nyahay and Fortune each present one issue asserting that the trial court erred when it denied their special appearance. Hereafter, we refer to Nyahay and Fortune jointly as Appellants.

## A.     Applicable Law

### 1.     *Standard of review*

As a question of law, we review de novo whether a trial court has personal jurisdiction over a nonresident defendant. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). Resolving this question of law, though, may require a court to decide questions of fact. *Id.* When, as here, the court does not issue findings of fact for its special-appearance decision, we presume that all fact disputes were resolved in favor of the decision and imply all relevant facts necessary to support the judgment that are supported by the evidence, unless they are challenged on appeal. *See id.*; *M & F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017).

### 2.     *Evidence to consider*

Because it affects our determination of whether the trial court properly denied their special appearance, we address Appellants' contention regarding what evidence may be considered in our analysis. In their briefs, Appellants argue that, because he was the only witness who testified at the special appearance hearing, Fortune's

16

testimony was the only evidence that the trial court could consider in determining the propriety of their special appearance. Specifically, they assert that "the trial court's decision to rely on testimony other than the testimony of [Fortune] is improper and is a clear failure to follow and apply Texas law." And they contend that "Texas case law and the plain language of existing holdings indicate that the trial judge may only rely upon the testimony proffered by witnesses who testify during a hearing on a verified special appearance." For this reason, they contend that USA offered insufficient evidence to support the trial court's denial. They assert that the trial court erred in denying their special appearance because the court relied on USA's purportedly insufficient evidence attached to its response.

Appellants cite no legal authority in support of this position, nor can we find any. To the contrary, Rule of Civil Procedure 120a, governing special appearances, provides that a trial court determines a "special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, *and any oral testimony." TEX. R. CIV. P. 120a(3) (emphasis added). Thus, the plain text of Rule 120a provides that the trial court was permitted to consider not only Fortune's oral testimony from the hearing but also the pleadings, affidavits, and evidence attached to USA's response. *See id.* On appeal, the scope of our review of a ruling on a special appearance includes all the evidence in the record. *PetroSaudi*

17

*Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 132 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Washington DC Party Shuttle, LLC v. IGuide Tours, LLC*, 406 S.W.3d 723, 729 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)). Thus, our consideration of the evidence is not limited to Fortune's testimony at the hearing.

### 3.    *Legal principles governing personal jurisdiction*

Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal due-process guarantees. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013)). The Texas long-arm statute permits jurisdiction over a nonresident doing "business in this state." The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042. This list, however, is not exclusive, and the statute's "doing business" requirement is limited only by the requirements of federal due process guarantees. *Cappuccitti v. Gulf Indus. Products, Inc.*, 222 S.W.3d 468, 479 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Thus, allegations that a defendant contracted with a Texas resident requiring one of the parties to perform at least part of the contractual obligation in Texas satisfies the

18

long-arm statute, *see id.*, but the allegations must also satisfy due-process requirements, *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). Here, USA alleged that Fortune and Nyahay solicited a contract with Precision, a Texas company, and that Nyahay and/or BDTP contracted with Precision, requiring it to perform at least part of the contract in Texas. As a result, the requirements for personal jurisdiction over Appellants are satisfied if exercising jurisdiction comports with federal due process.

Consistent with federal due process protections, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has established "minimum contacts" with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Luciano*, 625 S.W.3d at 8; *Moki Mac*, 221 S.W.3d at 575. The plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. *Luciano*, 625 S.W.3d at 8; *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). The burden then shifts to the defendant to negate all bases of jurisdiction in the allegations. *Luciano*, 625 S.W.3d at 8; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).

A defendant's contacts with the forum may give rise to either general or specific jurisdiction. *M & F Worldwide Corp.*, 512 S.W.3d at 885. Here, USA claimed only that Appellants' contacts gave rise to specific jurisdiction. The

19

minimum contacts necessary for specific jurisdiction are established if (1) the defendant purposefully avails itself of the privilege of conducting activities in the forum state, and (2) the suit arises out of or relates to the defendant's contacts with the forum. *Luciano*, 625 S.W.3d at 8–9; *Moki Mac*, 221 S.W.3d at 576.

Purposeful availment is the touchstone of the jurisdictional due process analysis. *Luciano*, 625 S.W.3d at 9; *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). "There must be 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Luciano*, 625 S.W.3d at 9 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The Supreme Court of Texas has identified three distinct aspects of the "purposeful availment" requirement. First, only the defendant's contacts with the forum are relevant, as a nonresident should not be called to court in a jurisdiction solely as a result of the unilateral activity of another party. *Michiana*, 168 S.W.3d at 785. Second, the defendant's acts must be purposeful, as opposed to random, isolated, or fortuitous. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* In applying this analysis, we focus on the nature and the quality of the nonresident's contacts with Texas, not the number of contacts. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016). "The defendant's activities, whether they consist of direct acts within Texas or conduct

20

outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

For a cause of action to arise from or relate to purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. When all the claims arise from the same forum contacts—as in this case—a claim-by-claim analysis is not required. *Moncrief Oil*, 414 S.W.3d at 150–51.

## B. Appellants' Texas Contacts

Standing alone, contracting with a Texas resident does not necessarily establish minimum contacts sufficient to support personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("[A]n individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum[.]"); *Jay Zabel & Assocs., Ltd. v. Compass Bank*, 527 S.W.3d 545, 554 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("It is well-established that merely contracting with a Texas resident does not satisfy the minimum contacts requirement." (internal quotation marks omitted)). But a single contract may establish sufficient minimum contacts when considered against a backdrop of "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [.]" *Burger King*,

471 U.S. at 479; *see Nance Int'l, Inc. v. Oceanmaster Eng'g PTE, Ltd.*, No. 01-11-00664-CV, 2012 WL 5381224, at *8 (Tex. App.—Houston [1st Dist.] Nov. 1, 2012, no pet.) (mem. op.) (holding that individual actions, such as payment in Texas, by nonresident who contracted with Texas resident did not show purposeful availment, but purposeful availment was established when several Texas contacts were considered together).

When determining whether a nonresident who contracted with a Texas resident had purposefully availed himself of the benefit of conducting business in Texas, courts have considered whether the nonresident initiated the relationship to specifically recruit the Texas resident for his skills, knowing that the resident would perform the contract in Texas. *See Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("It is reasonable to subject a nonresident defendant to personal jurisdiction in Texas in connection with litigation arising from a contract specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas."). For example, in *Nogle & Black Aviation, Inc. v. Faveretto*, the court held that a nonresident company purposefully availed itself of the privileges of doing business in Texas by employing a Texas engineer for design work that he performed in Texas. 290 S.W.3d 277, 283–85 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In reaching its holding, the court determined that the company's contacts in Texas were purposeful because (1) the

22

engineer did not unilaterally initiate the relationship with the nonresident company, (2) he was specifically chosen by the company because it "liked his work best," (3) the engineer performed his design work in Texas, and (4) his work was used to complete a product that the nonresident company sold for a profit. *Id.* at 283.

Like the Texas resident in *Nogle*, Precision did not unilaterally initiate a business relationship with Appellants.[4] In September 2017, Fortune paid the expenses associated with Crawford's family traveling from Texas to Ohio for Crawford's son to play in a baseball tournament. During that trip, Fortune and Crawford spoke about Precision assisting Fortune in building an indoor baseball facility. After Crawford returned to Texas, Fortune and Nyahay contacted Crawford to solicit Precision's services in procuring a building to use for the baseball facility in Ohio.

During the discussions that followed—and before a contract was signed—Crawford told Fortune that Precision would subcontract the design and construction

---

[4] When reviewing special appearance orders, "unless the defendant challenges [an implied] finding for factual sufficiency, we presume all factual disputes were resolved in favor of the trial court's decision." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 17 n.6 (Tex. 2021). In their briefs, Appellants challenge the sufficiency of USA's evidence only on the basis that USA did not offer live testimony at the special-appearance hearing. They do not challenge the factual sufficiency of the evidence to support any implied finding by the trial court. Thus, in our analysis, we presume that all factual disputes were resolved in favor of the trial court's denial of Appellants' special appearance. *See id.* at 8, 17 n.6. In making this presumption, we make no determination of the underlying merits but do so only to answer the limited jurisdictional question presented in this interlocutory appeal. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005).

of the building to USA, a company with which Precision had a long-term business relationship. Fortune told Crawford that he approved the use of USA's services. Fortune and Nyahay told Crawford that they were aware that Precision and USA would both perform their respective work in Texas relating to the acquisition of the building.

In January 2018, Fortune contacted Crawford in Texas to obtain a price quote from Precision for the building. After their initial solicitation of Precision, Appellants sought a financial benefit from the Texas company—namely, a reduced price for the building—by leveraging the personal relationship Fortune had developed with Crawford. At Fortune's request, Crawford prepared a price quote and contract for Precision to provide a fabricated metal building. The contract for the building listed Precision's Texas address.

After receiving the quote, Appellants chose to contract with Precision, and Nyahay signed and returned the contract. The evidence showed that Appellants chose Precision over other contractors located in other states, including Ohio, because Precision's price was lower than they could obtain elsewhere, thereby obtaining the benefit that they had sought from Texas. *See id.* In *Nogle*, the nonresident defendant solicited a Texas resident because he had a unique attribute— his superior engineering skills—here, Appellants solicited Precision because it also had a unique attribute—its ability to provide Appellants with the lowest price.

24

The Supreme Court of Texas has emphasized that "a nonresident may purposefully avoid a particular jurisdiction by structuring [his] transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785; *see Nogle*, 290 S.W.3d at 283 (purposeful-availment doctrine "recognizes that a defendant can make choices to avoid benefitting from activities in Texas"). Here, Appellants had the opportunity to avoid Texas by purchasing the building from a state other than Texas, including their home state of Ohio. But they chose not to do that. Instead, they chose to pursue and to contract with Precision to take advantage of the price benefit offered by the Texas company for work that Appellants acknowledged upfront would be performed in Texas. As in *Nogle*, not only did the jurisdictional evidence show that Appellants were aware at the time the contract was executed that work would be performed in Texas, but Precision performed its contracted-for work in Texas—using its established connection with USA to negotiate and enter into a subcontracting agreement with USA in Texas to obtain a reduced price for the building—and USA performed a necessary part of its work in Texas—designing and drawing the building's plans—a fact that "reinforces the exercise of specific jurisdiction." *Citrin Holdings*, 305 S.W.3d at 283; *see Shocktheory DLV, Inc. v. Tava Ventures, Inc.*, No. 05-21-00182-CV, 2021 WL 4304643, at *4 (Tex. App.—Dallas Sept. 22, 2021, no pet. h.) (mem. op.) (recognizing that "[a] contract's place of performance is important").

We conclude that Appellants' contacts with Texas, which were akin to the nonresident's contacts in *Nogle*, were purposeful—not random, fortuitous, or attenuated—and were directed at seeking a benefit from Texas.[5] *See Nogle*, 290 S.W.3d at 283; *see also Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *9 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) (holding nonresident defendants subject to specific jurisdiction when they specifically chose to use, and initiated contact with, Texas resident for her skill and expertise, knowing that she would perform her work in Texas, and she performed most of her work in Texas); *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 328 S.W.3d 545, 558 (Tex. App.—San Antonio 2010, pet. denied) (holding specific jurisdiction supported when nonresident company targeted and initiated contact with Texas resident, seeking to use his expertise, knowing that he would perform work in Texas and seeking profit

---

[5] In its response, USA also sought to enforce the forum-selection clause in Precision's contract, which designated Texas as the jurisdiction to litigate disputes under the contract. However, USA was a non-signatory to the contract. We note that the Supreme Court of Texas held in *Rieder v. Woods*—an appeal from the denial of a special-appearance—that the non-signatory to the contract there could not enforce the forum-selection clause. *See* 603 S.W.3d 86, 101 (Tex. 2020). Here, as discussed, Appellants have other contacts with Texas aside from the forum-selection clause, and we do not consider the forum-selection language, nor the accompanying choice of law language, to determine, as stated *infra*, that Appellants have sufficient minimum contacts with Texas. As Texas contacts, USA also pointed to communications sent to Texas by Appellants, such as Fortune's approval of USA's draft and final drawings, his correspondence related to the amount of sales tax to be charged, and a change order, which altered the building's design and increased its price, signed by Nyahay. However, these communications occurred after BDTP was legally formed, and we need not consider the communications to find that Appellants had sufficient minimum contacts with Texas.

from his work in Texas). Under the facts presented, Appellants could have reasonably anticipated that soliciting and selecting a Texas company to do work in Texas—knowing that the company's subcontractor would also perform its work in Texas—to provide a fabricated building, could lead to litigation in Texas for a claim arising out of the failure to pay for the building. *See Nogle*, 290 S.W.3d at 283.

We conclude that Appellants purposely availed themselves of conducting activities in Texas and that USA's claims arise from or relate to those purposeful contacts. Therefore, we hold that the pleadings and the evidence establish that Appellants had sufficient minimum contacts with Texas to be subject to personal jurisdiction.

## C.    Fiduciary-Shield Doctrine

Appellants also assert that, because any contacts they had with Texas were performed as agents for BDTP, the fiduciary-shield doctrine protects them from the exercise of specific jurisdiction. "Under the fiduciary shield doctrine, a nonresident officer or employee may not be subject to personal jurisdiction when all of his contacts with the forum state were made on behalf of his corporation or employer." *Yujie Ren v. ANU Res., LLC*, 502 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see Garner v. Furmanite Austl. Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). However, the doctrine has limits. It "does not protect a corporate officer from specific personal jurisdiction as to

intentional torts or fraudulent acts for which he may be held individually liable." *Steamboat Capital Mgmt. v. Lowry*, No. 01-16-00956-CV, 2017 WL 5623414, at *10 (Tex. App.—Houston [1st Dist.] Nov. 21, 2017, no pet.) (mem. op.).

We have also held that the fiduciary-shield doctrine does not protect a corporate officer from being subject to specific jurisdiction in his individual capacity with respect to conduct that he engaged in prior to the creation of the company for which he claimed he was acting. *Cappuccitti*, 222 S.W.3d at 486; *see Citrin Holdings*, 305 S.W.3d. at 284 (holding that Texas contacts arising from activities of company's agent, pre-dating company's creation, cannot be attributed to company for purposes of determining specific jurisdiction); *Cagle v. Clark*, 401 S.W.3d 379, 392 (Tex. App.—Texarkana 2013, no pet.) (considering nonresident defendant's "contacts prior to the formation of [the business entity] as contacts conducted in [defendant's] individual capacity"); *see also Fish v. Tandy Corp*., 948 S.W.2d 886, 897 (Tex. App.—Fort Worth 1997, pet. denied) ("A nonexistent corporation can have no agent."). Here, as pleaded, USA's quantum-meruit, unjust enrichment, and prompt payment act claims against Appellants relate to the alleged conduct engaged in by Fortune and Nyahay before BDTP was formed as a company on February 6, 2018.

Crawford's affidavit, offered in support of USA's response, indicated that Fortune began soliciting him in the spring of 2017 for the purpose of obtaining

Precision's assistance with procuring a building for the indoor baseball facility. Crawford averred that Fortune told him that "he wanted to build an indoor baseball facility that would allow youth baseball teams and individual players to practice indoors, and attend instruction on various baseball mechanics." Crawford testified that Fortune did not hold himself out as BDTP's representative or attorney. Instead, "Fortune made clear to [him] that the building of the indoor facility was a personal venture."

Between September 2017 and January 2018, Fortune continued to contact Crawford, and during that period, he asked Crawford if he would bring Fortune's "dream of an indoor baseball stadium to fruition." Fortune asked Crawford to provide the building at a reduced cost based his personal relationship with Crawford. Crawford averred that he "understood that Fortune was acting on his own behalf and he did not say or do anything that would have led me to believe that he was acting for an entity or someone else." Crawford further testified that Nyahay also participated in the solicitation of Precision's services during this period.

Crawford stated that, in January 2018, Fortune contacted him "to solicit a price quote from Precision to an entity called BDTP, LLC for construction of the building" that he and Crawford "had previously discussed." Crawford testified that "was the first time [he] had heard of BDTP, LLC." Based on the record, we conclude that the fiduciary-shield doctrine does not apply to protect Appellants from the trial

29

court's exercise of specific jurisdiction because BDTP had not yet been formed when the conduct supporting the sufficient minimum contacts with Texas occurred. *See Lucas*, 2019 WL 2635561, at \*10 (holding that fiduciary-shield doctrine did not protect officer of limited liability company because plaintiff alleged that officer was acting in his individual capacity when he "sought [Texas plaintiff] out to take advantage of her experience, contacts, and reputation to expand [company's] business in Texas").

## D.    Traditional Notions of Fair Play and Substantial Justice

Finally, having determined that Appellants had minimum contacts with Texas sufficient to support specific jurisdiction, we must determine whether subjecting them to the jurisdiction of Texas would offend traditional notions of fair play and substantial justice. *See Retamco Operating*, 278 S.W.3d at 341. In making this determination, we consider (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining relief, (4) the interstate justice system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the

nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assur., Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991). To defeat jurisdiction, Appellants must present "'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Id.* at 879 (quoting *Burger King*, 471 U.S. at 477).

Appellants do not present a compelling case here. In their special-appearance affidavits, Nyahay and Fortune each attested that he would "incur substantial burden and expense because [he did] not have an office or residence in Texas and [would] be required to fly across the country to defend this litigation." Other than arguing that they would incur expense and be required to travel cross-country, Appellants offered no other reason in their special appearance to show a compelling case of unreasonableness.

We acknowledge that subjecting Appellants to suit in Texas "certainly imposes a burden on them, but the same can be said of all nonresidents." *Moncrief Oil Int'l*, 414 S.W.3d at 155. "Distance from the forum is generally not sufficient to defeat jurisdiction because the availability of 'modern transportation and communication have made it less burdensome for a party sued to defend himself in a state where he engages in economic activity.'" *Paul Gillrie Inst., Inc. v. Universal Computer Consulting, Ltd.*, 183 S.W.3d 755, 764 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). And,

31

while the burden on the nonresident defendant is a consideration in our due process analysis, it is not determinative. *See Guardian Royal Exch.*, 815 S.W.2d at 231.

One of USA's claims against Appellants alleges a violation of the Property Code's Prompt Payment to Contractors Act. The plain language of section 28.002 of that act indicates that its purpose is to ensure that contractors and subcontractors are promptly paid for valuable services and materials provided. *See* TEX. PROP. CODE § 28.002. By virtue of the Legislature's enactment of the prompt payment statute, Texas has demonstrated a special interest in protecting contractors in this state from the type of conduct alleged here. *See Luciano*, 625 S.W.3d at 19.

We are also mindful that USA has filed claims in this suit against Precision and the Crawfords, who are Texas residents. Litigating the claims as to all parties in one court would promote it promote judicial economy. *See Moncrief Oil Int'l*, 414 S.W.3d at 155; *Spir Star AG v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010) ("[B]ecause the claims against [the resident defendant] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place."). Thus, while Ohio may also have an interest in this dispute, our judicial system's interest in obtaining "the most efficient resolution of controversies" supports the exercise of jurisdiction in Texas. *See TV Azteca*, 490 S.W.3d at 56.

We hold that the trial court's exercise of personal jurisdiction over Appellants does not offend justice or fairness.[6] Having already determined that Appellants have sufficient minimum contacts with Texas to be subject to personal jurisdiction here, we hold that the trial court did not err when it denied Appellants' joint special appearance.

We overrule Appellants' sole issue.

---

[6]     Although not argued in the trial court, Nyahay asserts on appeal that USA's claims against Appellants should be dismissed based on the following Ohio statute:

> Any provision of a construction contract . . . for an improvement, or portion thereof, to real estate in this state that requires any litigation . . . provided for in the construction contract, subcontract, agreement, or understanding to occur in another state is void and unenforceable as against public policy. Any litigation . . . provided for in the construction contract, subcontract, agreement, or understanding shall take place in the county or counties [in Ohio] in which the improvement to real estate is located . . . .

O.R.C. § 4113.62(D)(2). While this statute appears to govern litigation filed in Ohio involving disputes arising out of construction contracts, it does not compel us to dismiss this case, filed in Texas.

## Conclusion

We affirm the trial court's order denying Nyahay's and Fortune's joint special appearance. As previously ordered, BDTP's appeal is dismissed.

                                                      Richard Hightower
                                                      Justice

Panel consists of Justices Kelly, Hightower, and Farris.